UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

RUBEN HOGUE, # 255155,               )
                                     )
                    Petitioner,      )        Case No. 1:07-cv-173
                                     )
v.                                   )        Honorable Robert Holmes Bell
                                     )
STATE OF MICHIGAN,                   )
                                     )        **REPORT AND RECOMMENDATION**
                    Respondent.      )
_____ )

       This is a habeas corpus proceeding brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner is serving a sentence of 6-to-25 years, imposed by the Kent County Circuit Court on February 10, 2005, after a jury convicted petitioner of possessing a place used to manufacture a controlled substance. MICH. COMP. LAWS § 333.7401c(1). Petitioner's sentence was enhanced under MICH. COMP. LAWS § 769.12 because of his status as an habitual offender, owing to his ten previous felony convictions. Petitioner forfeited his appeal as of right because of his failure to apply for appointed counsel within the time allowed by state law. Appointed counsel did, however, move for a new trial in the circuit court, raising two of the issues contained in the habeas corpus petition. In an opinion and order entered February 14, 2006, Judge Dennis Kolenda denied relief. The state Court of Appeals and Supreme Court thereafter denied petitioner's application for leave to appeal on four claims. This habeas corpus action followed.

       The *pro se* habeas corpus petition, read with the required liberality, raises four grounds for relief:

I.      Violation of the Double Jeopardy Clause arising from retrial after the grant of a defense motion for a mistrial during opening statements.

II.     Due process violation arising from admission of evidence of uncharged crimes.

III.    Due process violation arising from a false statement made by prosecution witness Brad Little concerning the nature of charges pending against the witness.

IV.     *Brady* violation arising from the prosecutor's failure to provide defense counsel with correct information concerning charges then pending against prosecution witness Brad Little.

(Petition, ¶ 14, docket # 1).

Respondent has filed an answer to the petition, addressing each claim on its merits and arguing that petitioner has failed to establish grounds for habeas corpus relief. This matter has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 10 of the Rules Governing Section 2254 Proceedings in the District Courts. Upon review of the state-court record and the submissions of the parties, I conclude that the petition is meritless and recommend that it be denied.

## **Proposed Findings of Fact**

### **A.      Facts Leading Up To State-Court Prosecution**

The police became interested in petitioner as the result of information provided to them by Brad Little, a confidential informant who was working with the Central Michigan Enforcement Team (CMET) in consideration for leniency on criminal charges then pending against Little. Little told CMET that petitioner was cooking and selling methamphetamine. He agreed to work with CMET to lead them to petitioner's operation.

At the time, petitioner was living with his girlfriend, Amanda Cramer, in a trailer in Spencer Township, in Kent County, Michigan.  On May 25, 2004, Little called a member of the CMET team to tell them that he was about to drive to petitioner's trailer in a red Ford truck for the purpose of cooking methamphetamine.  Officers set up a surveillance unit to follow and observe Little and petitioner.  They followed Little and watched him as he entered petitioner's trailer.  Little sent officers a text message, indicating that petitioner was working on the first phase of cooking methamphetamine.  Little left the house, accompanied by another man, who turned out to be petitioner.  The two men entered the red truck, with Little driving and petitioner sitting in the passenger seat.  Surveillance officers followed the truck from petitioner's trailer park.  The truck began to take evasive measures in order to elude police, leading the officers to believe that petitioner suspected that he and Little were being followed.

When the truck pulled into a closed gas station, officers concluded that they should stop the vehicle.  They called in a marked police car to make a traffic stop.  Both occupants were removed from the vehicle, to preserve the status of the confidential informant.  At the feet of petitioner, officers found equipment distinctive for creating methamphetamine.  The truck carpet was wet, and officers noticed a strong chemical smell that they associated with methamphetamine labs.  They found on petitioner's person several coffee filters, which are used in the manufacture of methamphetamine.  Petitioner denied even knowing the confidential informant, contending that he only hitched a ride with Little and had never met him before.  Officers returned to petitioner's trailer, where they encountered his girlfriend Amanda Cramer.  She allowed officers to search the trailer, but they found nothing incriminating.  A search of the garbage can, however, uncovered blister

packets for pseudoephedrine, soaked paper towels, and other items indicating the manufacture of methamphetamine.  Subsequent fingerprint analysis found petitioner's prints.

On the basis of the foregoing evidence, the Kent County Prosecutor decided not to charge petitioner with manufacture of methamphetamine.  Rather, petitioner was charged under a provision of the Public Health Code that makes it a crime to own or possess a building, structure, vehicle or other place when the defendant knows or has reason to know the place is being used or will be used to manufacture a controlled substance.  The same statute makes it a crime to own or possess any chemical or any laboratory equipment that the defendant knows or has reason to know is to be used for the purpose of manufacturing drugs.  MICH. COMP. LAWS § 333.7401c(2)(f).

### B.     Mistrial

Trial commenced on Wednesday, January 19, 2005, with selection of a jury.  (*See* certified docket sheet, docket # 13, event 29).  On Thursday, January 20, 2005, Judge Kolenda delivered preliminary instructions to the jury. (Tr., docket # 15).  Immediately thereafter, Assistant Prosecutor Helen V. Brinkman delivered the People's opening statement. (Tr., docket # 16).  During the opening statement, Ms. Brinkman repeated several statements made to officers by the confidential informant, Brad Little.  For example, she reported to the jury Little's initial telephone call to the CMET team, in which he informed them that he and petitioner would be driving a red truck to petitioner's trailer for the purpose of cooking methamphetamine.  (*Id.* at 28).  She also related Little's text message to officers, in which Little informed them that he and petitioner would be leaving the trailer park for purposes of processing the rest of the methamphetamine at a different

location.  (*Id.* at 29).  At the end of the opening statement, retained defense counsel, Louise Herrick,

immediately asked for a conference with the court.  (*Id.* at 35-36).

    The court apparently conducted an in-chambers conference with counsel outside the

presence of the jury.  The transcript indicates that the assistant prosecutor's opening statement ended

at about 9:50 a.m., but that court did not reconvene until 11:25 a.m.  (Tr., docket # 17).  At that time,

defense counsel Herrick moved for a mistrial on the basis of a Confrontation Clause violation.

Defense counsel recited that the confidential informant was unavailable and would not be testifying

and that the assistant prosecutor's repetition of statements attributable to Mr. Little violated his right

to confront the witnesses against him.  (*Id.* at 3-4).  Assistant Prosecutor Brinkman conceded that

Mr. Little would not be testifying at trial.  A warrant had been issued for his arrest as a material

witness, but officers were unable to procure his presence.  She nevertheless argued that Little's

statements were not objectionable, because they were not admitted for the proof of the matter

asserted, but simply to show why officers were following petitioner in the first place.  (*Id.* at 4).

Judge Kolenda, relying on the Supreme Court's then recent opinion in *Crawford v. Washington*, 541

U.S. 36 (2004), held that the issue was not governed by the hearsay rules, but by the prohibition

expressed by the Supreme Court in *Crawford* against the introduction of testimonial statements of

a witness unavailable for cross-examination.  The court therefore granted defense counsel's motion

for mistrial.  "Accordingly, a mistrial, as requested by the defense, is granted."  (*Id.* at 4-6).

C.    **Retrial**

The retrial commenced on February 7, 2005, with the selection of a new jury and the delivery of opening statements. (Trial Transcript (TT) I, docket # 18). By the time the retrial commenced, police had procured the presence of the confidential informant, Brad Little. The assistant prosecutor's opening statement therefore followed the same general outline as her original statement, as Little's presence at trial eliminated any Confrontation Clause issue that had existed at the first trial. (*Id.* at 139-53).

During defense counsel's opening statement, she attacked Little's credibility: "You're gonna hear from Brad Little. Brad Little is a confidential informant. Not only was he trying to work off his driving while license suspended, he had a meth case in Newaygo all of his own. That's the rest of the story." (*Id.* at 154). Counsel submitted that the proof would not be sufficient to establish beyond a reasonable doubt that petitioner knew that the drug paraphernalia was in the truck, that he possessed these items, or that he did so for the purpose of processing methamphetamine. (*Id.* at 154-55).

The prosecution's case consisted of testimony from police officers and the confidential informant, Brad Little. Detective Robert McVey testified concerning the surveillance of Little and petitioner and described officers' eventual search of Little's vehicle. As officers approached the vehicle, they noticed a very strong chemical smell which McVey recognized as being from a methamphetamine lab. (TT II, 29-30, docket # 19). Sgt. Joel Abendroth seized suspected methamphetamine laboratory equipment from the passenger side of the car, including a plastic bottle and some glass jars, which McVey logged into the evidence room. (TT II, 31-32). Sgt. Abendroth noticed a very strong odor of solvents coming from the vehicle. Upon searching the vehicle, he

found on the car seat two glass containers and on the floorboard an AquaFina bottle with a hose attached to it by duct tape.  (TT III, 3-5, docket # 20).  He found coffee filters both in the car and in petitioner's coat pocket.  (*Id.*, 5, 32).  He recounted petitioner's statements to police at the time of arrest, in which petitioner denied any knowledge of methamphetamine production and claimed that the strong chemical odor was a gas leak.  (TT III, 35-37).

Detective Chad Jones was involved in the consent search of Amanda Cramer's trailer and environs.  He noted a strong, distinct odor like paint thinner coming from a garbage bag on the porch.  When he opened it, he found remnants of a suspected methamphetamine lab, including an empty two-ounce can of paint thinner, opened lithium battery packs, empty pseudoephedrine blister packs, and a white pasty substance in a soaked paper towel.  (TT II, 116-129).

Douglas Westrate, a fingerprint examiner with the Michigan State Police, compared latent fingerprints lifted from glass jars seized from the crime scene with fingerprints taken from both petitioner and Brad Little.  Only two prints were good enough for purposes of making an identification.  Both fingerprints matched those of petitioner.  (TT III, 68-72).

The testimony of the confidential informant, Brad Little, began with a session outside the presence of the jury, designed to allow the court to decide evidentiary issues.  (TT II, 41).  The examination by the assistant prosecutor moved immediately into the question whether Little had been promised anything in exchange for his testimony.  Little answered, "No."  (*Id.*, 42).  Assistant Prosecutor Brinkman indicated that when she and Little had spoken the previous day, Little had mentioned a "deal" for his testimony.  Little responded, "About a DWLS [driving while license suspended]?"  The questioning continued as follows:

Q       Did you mention anything else?

A       No.

Q       Is there anything else?

A       No.

Q       Ms. Herrick indicated that there was a cocaine case that was dismissed in Newaygo County.  Was that related to this case?  I'm sorry, not a cocaine. Was it a meth case?

A       No, it was cocaine.

Q       Oh, it was cocaine.  Okay.  Was that dismissed in relationship to this?

A       I guess.

Q       Okay.  So that was something that was promised you, as well, or . . .?  Is there any reason why you didn't bring that up yesterday?

A       No, there's no reason I didn't bring it up.

Q       Okay.  Did you remember it yesterday or I guess I'm wondering why you wouldn't have told me.

A       No, actually I did, and there's been a few DWL's -- driving while license suspended that's been dropped.  There's been a few things that's whatnot that's already been dropped.

Q       Okay.  Is there anything else other than this cocaine case or this -- the driving while license suspended cases that have been offered to you for your testimony or involvement in this case?

A       No.

Q       Okay.  Are you willing then to testify to the jury regarding the events of that date based on what you've just told me?

A       Sure.

(TT II, 42-44).

-8-

After Ms. Brinkman's examination, Judge Kolenda further inquired about the nature of drug charges against Little:

BY THE COURT:

Q   Mr. Little, what kind of case -- what kind of cocaine case was it up North?  Just possession, possession with intent to deliver, delivery, what?

A.   Possession.

(TT II, 44).

The jury was then brought back into the courtroom, and the assistant prosecutor began the examination of Brad Little.  Little testified that he had seen petitioner make methamphetamine before May 25, 2004.  (TT II, 46).  Little then described the process by which he offered to become a confidential informant for police concerning petitioner's manufacture of methamphetamine.  (TT II, 46-48).  He described the events of May 25, 2004, during which Little observed petitioner engage in the first stage of methamphetamine manufacture at the trailer of Amanda Cramer.  (TT II, 49-56).  After finishing, petitioner put the leftover materials in a trash bag and placed it on the front porch.  The men packed everything else into the truck, and Little began to drive to another location, at which the manufacturing process would be completed.  (TT II, 57-59).  At some point, petitioner realized that the truck was being followed and told Little to take evasive action.  (TT II, 58-59).  During this time, the mixture concocted by petitioner at the trailer was in a Mason jar between petitioner's legs on the floor.  (TT II, 61-62).  Ultimately officers stopped the truck, took both men into custody, and seized the jar and other materials from them.  (TT II, 62-63).  By then, the contents of the jar were spilled onto the carpet.

The assistant prosecutor then raised the issue of consideration for petitioner's testimony.

Q    Okay.  But you were charged --

A    But --

Q    I'm sorry.  Go ahead.

A    I was charged with what?  I ended up being charged with DWLS.

Q    And for the jurors who don't know what that means, what does that mean?

A    Driving while license suspended.

Q    And were you offered anything in exchange for your testimony here today as a result of that?

A    Just dropping the DWLS.

Q    Did they drop the DWLS?

A    Not yet.

Q    Okay.  And, in fact, we had a conversation earlier and you told me about the driving while license suspended agreement, correct?

A    Correct.

Q    But you -- Ms. Herrick indicated during her opening that there was a cocaine charge in Newaygo County or some other county; is that correct?

A    Newaygo.

Q    All right.  And just a while ago prior to coming in here, you told us about that.  Was there a case in Newaygo County where you were given a dismissal for your cooperation?

A    Yes.

Q    And was it related to this case?

-10-

A       It was.

Q       All right.  Is there any reason why you didn't let me know that yesterday or --

A       It was -- it was just so long ago.

Q       Okay.  And your driving while license suspended charge is still pending?

A       One of them, yeah.

Q       Okay.  Are you getting anything else for your testimony other than what you've just told us just now?

A       No.

(TT II, 64-66).

On cross-examination, defense counsel accused Little of being very familiar with the process of manufacturing methamphetamine and asked whether he indeed had not been burned in February 2004 because of a laboratory explosion.  He denied both.  (TT II, 69).  Defense counsel asked Little whether he recalled being arrested in May of 2004 for driving on a suspended license and possession of cocaine.   After Little answered "Yeah," defense counsel asked whether, in exchange for his cooperation against petitioner, these charges were "going to go away."  Little testified that the case against him had already been dismissed in exchange for his cooperation.  (TT II, 69-70).  The remainder of the cross-examination was principally designed to demonstrate that Little had "set up" petitioner in an effort to save himself from pending charges.

After redirect examination, the court again inquired concerning the nature of drug charges against Little.

BY THE COURT:

Q       Mr. Little, I want to clear up a couple things and I want to talk to the lawyers and then we'll let you go.  You said you had a cocaine charge in Newaygo.

-11-

There are all kinds of different charges.  What was this one, possession, possession with intent to deliver, or delivery of the stuff?

A      Possession.

Q      Simple possession?

A      Simple possession.

(TT II, 94-95).

After the prosecution rested, defense counsel called two witnesses.  Nate Szelle testified that he was at petitioner's trailer on the evening of May 24, 2004, but did not go in.  He did not notice any chemical smell.  While Szelle was on the porch, Brad Little appeared in a truck.  Petitioner said that he had to go to find his girlfriend, Amanda Cramer.  Petitioner got into Little's truck, and the two drove away.  The witness did not recall seeing anything in petitioner's hands.  (TT III, 80-88).  Amanda Cramer testified that she had been "dating" petitioner for a year and three months, and that they had a child together.  On May 24, 2004, Brad Little came to their trailer three times.  She testified that Little was a user of methamphetamine, and she admitted that she had used methamphetamine herself in the past.  She testified that she never smelled anything in the house and denied that petitioner was involved in cooking methamphetamine.  She could not explain how the methamphetamine ingredients wound up in her garbage can.  When officers appeared at the trailer, she allowed them to come in and to search the house, but they did not find anything.  (TT III, 93-110).

In rebuttal, the prosecutor recalled Detective Chad Jones, who testified that in her statements to police Amanda Cramer said that she went for a walk as soon as Brad Little showed up at the trailer.  (TT III, 135-36).  The prosecution also called Myrick Boring, a friend of petitioner and

Amanda Cramer, who testified that on one occasion he and petitioner cooked methamphetamine together in Cramer's presence.  (TT III, 147-50).

Both attorneys delivered final arguments. In defense counsel's final argument, she asserted that Brad Little had a motive to frame and set up petitioner, because Little was working off unrelated criminal charges:  "He was going to work off a driving while license suspended. Remember that?  And then I got up and said, uh, wait a minute, it's way more than just a little driving while license suspended.  He's got a possession of cocaine case."  (TT III, 170-71).  She argued that Little therefore had a motive "to provide somebody, in this case, Ruben Hogue, on a silver platter."  (*Id.*, 171).

The court delivered final instructions.  The jury was excused for purposes of deliberation on Wednesday, February 9, 2005, at 4:08 p.m.  (TT III, 236).  At about 11:56 a.m. on the next day, the jury returned a unanimous verdict of guilty.  (TT IV, 3-4, docket # 21).

Petitioner appeared before the court for sentencing on Monday, March 28, 2005.  (*See* Sentencing Transcript (ST), docket # 22).  Most of the effort expended at the sentencing hearing was directed to clarifying petitioner's considerable criminal history.  The court found that petitioner was at least a fourth-felony offender and that he would be sentenced under the habitual offender law. (ST, 9).  The court imposed a sentence of 6-to-25 years, which fell within the state sentencing guidelines, citing petitioner's "outrageous" criminal history, which included ten prior felonies.  (*Id.*, 12).

### D.    Post-Trial Proceedings

Petitioner requested the appointment of appellate counsel, but his motions were denied more than once because of the court's perception that petitioner was giving evasive answers concerning his assets and indigence.  Acting *pro se*, petitioner filed a delayed application for leave to appeal on July 22, 2005.  By order entered September 14, 2005, the Chief Judge of the Court of Appeals dismissed the application as untimely.  (*See* Court of Appeals Record in case no. 264034, docket # 24).  On August 26, 2005, before the Court of Appeals acted, Judge Kolenda granted petitioner's third motion for the appointment of appellate counsel, even though the time for an appeal of right had expired.  Appellate counsel ordered transcripts of the trial court proceedings and, on January 13, 2006, filed a motion for new trial.  The motion raised two grounds for relief:  (1) violation of the Double Jeopardy Clause arising from holding of a second trial after the court granted defense counsel's motion for mistrial, and (2) prejudicial error arising from introduction of evidence of other criminal behavior.

The court conducted a hearing on the motion for new trial on February 10, 2006.  (Tr., docket # 23).  During the hearing, appellate counsel for petitioner declined the court's invitation to hold an evidentiary hearing and conceded that he had no evidence to support a finding that the assistant prosecutor had initially provoked a mistrial.

By opinion and order entered February 14, 2006, Judge Kolenda analyzed and rejected both claims.  First, the court found that the only ground under federal or Michigan law for finding a double jeopardy violation arising from retrial after the grant of a *defense* motion for mistrial is a finding that the prosecution "intended to provoke a mistrial."  (Opinion and Order of 2/14/06 (Op.) at 1, found in Court of Appeals Record in case no. 269403, docket # 26) (citing *Oregon v.*

-14-

*Kennedy*, 456 U.S. 667 (1982)).  Judge Kolenda noted that petitioner conceded that he would not be able to prove that the prosecutor's improper opening statement at the first trial was intended to provoke a mistrial, even if he were granted an evidentiary hearing to do so.  Judge Kolenda rejected petitioner's assertion that Michigan law recognized a second ground for a double jeopardy violation, namely, whether the prosecutor "engaged in conduct known to be improper and prejudicial with indifference to a significant resulting danger of mistrial or reversal."  (Op., 1).  He found that this alternative test was not supported by Michigan law and that the double jeopardy provision of the Michigan Constitution was intended "to accord the same protection provided by the Fifth Amendment to the federal Constitution."  (Op., 2).  Given the lack of any evidence that the prosecutor's erroneous opening statement was meant to provoke a mistrial, Judge Kolenda denied the request to vacate petitioner's conviction on double jeopardy grounds.  With regard to the evidentiary issue, the court found that the fleeting references to the fact that petitioner was the "target of an investigation" or that his fingerprints were on file with the State Police did not inform the jury of prior convictions and in any event were not prejudicial.  (*Id.*).

### E.    Appellate Proceedings

Appointed appellate counsel filed an application for leave to appeal to the Court of Appeals.  (*See* Application, found in Court of Appeals Record in case no. 269403, docket # 26).  Counsel's application conceded that petitioner had forfeited his appeal as of right because of his failure to request counsel in a timely fashion.  The application nevertheless argued that petitioner should be granted leave to appeal on four grounds:  (1) violation of the Double Jeopardy Clause of the United States and Michigan Constitutions arising from retrial after the grant of the defendant's

request for a mistrial; (2) violation of due process arising from admission of evidence of prior, uncharged crimes; (3) violation of due process arising from the prosecutor's misstatement of facts and use of perjured testimony; and (4) a request for a new trial based upon allegedly newly discovered evidence, namely, a document from the 78th District Court (Newaygo County) showing that Brad Little had been arrested on May 19, 2004, for possession of methamphetamine, not cocaine. By order entered June 29, 2006, the state Court of Appeals denied the application for delayed appeal "for lack of merit on the grounds presented." (docket # 26).

On August 18, 2006, petitioner filed a *pro se* application for leave to appeal to the Michigan Supreme Court. The *pro se* application raised the same four issues asserted by appointed counsel in the Court of Appeals, as well as allegedly "new issues" which were essentially confusing reiterations of the arguments made by appellate counsel. By order entered December 28, 2006, the Michigan Supreme Court denied leave to appeal. (*See* Supreme Court Record in case no. 131897, docket # 27).

On February 23, 2007, petitioner initiated the present habeas corpus action. His *pro se* petition attaches appellate counsel's brief as well as the *pro se* application that petitioner submitted to the state Supreme Court. Read with the required liberality, the petition raises the four grounds set forth on page 2 of this report and recommendation. In essence, petitioner once again asserts a double jeopardy claim, arguing that Judge Kolenda should have applied an alternate standard arising from language in a state Court of Appeals case. He also asserts a due process violation arising from admission of alleged evidence of uncharged crimes. Next, he presents arguments arising from the assertion that the confidential informant, Brad Little, was facing methamphetamine charges in Newaygo County and not possession of cocaine charges. Petitioner

argues that the prosecutor knowingly presented perjured testimony in this regard and that the prosecutor's failure to procure and produce records from the 78th District Court showing the true nature of the charges then pending against petitioner violated *Brady v. Maryland*, 373 U.S. 83 (1963). For the reasons set forth below, I find that all of petitioner's habeas corpus claims are completely meritless.

## **Applicable Standard**

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir. 2008). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Wilkins v. Timmerman-Cooper*, 512 F.3d 768, 774 (6th Cir. 2008). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); *see Waddington v. Sarausad*, 129 S. Ct. 823, 831 (2009). *De novo* review is restricted to instances where the state court did not address the merits of a claim. In that limited set of circumstances, "there are simply no results, let alone reasoning, to which [the habeas] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also*

*Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *Van v. Jones*, 475 F.3d 292, 293 (6th Cir. 2007); *Maples v. Stegall*, 427 F.3d 1020, 1025 (6th Cir. 2005).

The AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). Section 2254(d) states that an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Section 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning. A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than the [Supreme Court] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. at 694 (citations omitted). A federal court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from Supreme Court decisions, but unreasonably applies it to the facts of the particular case, or if the state court unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

"It is important to note, however, that 'an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law.'" *Harbison v. Bell*, 408 F.3d 823, 829 (6th Cir. 2005) (quoting *Williams*, 529 U.S. at 409); *Waddington*, 129 S. Ct. at 831; *Fleming v. Metrish*, 556 F.3d 520, 525 (6th Cir. 2009). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *see Walls v. Kontech*, 490 F.3d 432, 436 (6th Cir. 2007). Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410; *see Bell v. Cone*, 535 U.S. at 694; *Keith v. Mitchell*, 455 F.3d 662, 669 (6th Cir. 2006) ("The proper inquiry under the 'unreasonable application' analysis is whether the state court decision was objectively unreasonable and not simply erroneous or incorrect."), *cert. denied*, 549 U.S. 1308 (2007); *Payne v. Bell*, 418 F.3d 644, 653 (6th Cir. 2005) ("A state court decision involves an 'unreasonable application' of clearly established Supreme Court precedent when it correctly identifies the governing legal standard but applies it to the facts before it in an objectively unreasonable manner.") (citations omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. at 412; *Wilson v. Parker*, 515 F.3d at 691; *Ross v. Petro*, 515 F.3d 653, 660 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 906 (2009). This court may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *See Williams*, 529 U.S. at 381 ("If this Court has not broken sufficient legal ground to establish an asked for

constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar."); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).

The AEDPA standard includes an important temporal limitation. "'[C]learly established Federal law as determined by the Supreme Court of the United States,' refers to 'the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Dennis v. Mitchell*, 354 F.3d 511, 517 (6th Cir. 2003) (quoting *Williams*, 529 U.S. at 412); *see Fautenberry v. Mitchell*, 515 F.3d 614, 623 (6th Cir.), *cert. denied*, 129 S. Ct. 412 (2008). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see Miller v. Webb*, 385 F.3d 666, 672 (6th Cir. 2004) (describing the issue of whether the law was clearly established by Supreme Court precedent as a "threshold inquiry"). "'Federal Courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation.'" *Payne*, 418 F.3d at 656 (quoting *Cone v. Bell*, 543 U.S. at 455). "The state court decision need not cite Supreme Court precedent, or even reflect awareness of Supreme Court cases, 'so long as neither the reasoning nor the result of the state court decision contradicts them.'" *Dennis*, 354 F.3d at 517-18 (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)).

Regardless of the subsection of 2254(d) relied on by the petitioner, AEDPA requires heightened respect for state factual findings. 28 U.S.C. § 2254(e)(1); *see Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence 28 U.S.C. § 2254(e)(1); *Owens v. Guida*, 549 F.3d 399, 404 (6th Cir. 2008); *Ivory v.*

-20-

*Jackson*, 509 F.3d 284, 291 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 1897 (2008).  This presumption

of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner*

*v. Mata*, 449 U.S. 539, 546 (1981); *Tucker v. Palmer*, 541 F.3d 652, 665 (6th Cir. 2008).

## Discussion

### I.      **Double Jeopardy Violation**

The Double Jeopardy Clause of the Fifth Amendment states that no person shall "be

subject for the same offense to be twice put in jeopardy of life or limb."  The Fourteenth

Amendment's Due Process Clause extends the protections of the Double Jeopardy Clause to state

prosecution.  *See Benton v. Maryland*, 395 U.S. 784, 794 (1969).  Under settled double jeopardy

jurisprudence, jeopardy is deemed to attach when a jury is sworn.  *See Crist v. Bretz*, 437 U.S. 28,

37-38 (1978).  Petitioner asserts that the trial court's grant of the defense motion for a mistrial after

the prosecutor's opening statement on January 20, 2005, prevented his retrial under double jeopardy

principles.

In his written opinion of February 14, 2006, Judge Kolenda analyzed and rejected

petitioner's double jeopardy claim.  To prevail on this claim in a habeas corpus case, petitioner must

show that Judge Kolenda's decision was contrary to or represented an unreasonable application of

clearly established holdings of the United States Supreme Court.  28 U.S.C. § 2254(d)(1); *see*

*Williams*, 529 U.S. at 409.  The governing Supreme Court authority on this issue is *Oregon v.*

*Kennedy*, 456 U.S. 667 (1982).  In the *Kennedy* case, the Supreme Court noted that where a trial is

terminated over the objection of a defendant, the classical test for lifting the double jeopardy bar to

a second trial is the "manifest necessity" standard.  456 U.S. at 672.  But in the case of a mistrial

declared at the request of a defendant, "quite different principles come into play." *Id.* In such circumstances, the defendant himself has elected to terminate the proceedings against him, so the "manifest necessity" standard has "no place" in the application of the Double Jeopardy Clause. Consequently, where the mistrial is declared at the defendant's own request, double jeopardy does not bar retrial, except in the "narrow" circumstance in which the prosecutor's actions giving rise to the motion for mistrial were done in order to "goad" the defendant into requesting a mistrial. *Id.* at 673 (citing *United States v. Dinitz*, 424 U.S. 600, 611 (1976)). The *Kennedy* Court rejected a broader standard, which would allow a defendant to avoid a mistrial upon a showing of bad faith conduct or harassment on the part of the prosecutor. "Prosecutorial misconduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." *Id.* at 675-76. "Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Id.* at 676.

In analyzing petitioner's double jeopardy claim, Judge Kolenda specifically relied on and applied the Supreme Court's decision in *Oregon v. Kennedy*. (Opinion and Order, 2/14/06, found in Court of Appeals Record, docket # 26). He rejected the double jeopardy claim, because of petitioner's concession that "even if afforded an evidentiary hearing, he will not be able to prove that the prosecutor's improper opening statement at the first trial in this case was intended to provoke defendant's trial counsel's request for a mistrial." (Op., 1). As the state circuit court relied on the governing Supreme Court case and accurately applied the appropriate federal standard to the

-22-

uncontested facts, that decision easily withstands scrutiny under AEDPA. The only basis for a successful double jeopardy claim under the *Oregon v. Kennedy* standard is that the prosecutor intended to provoke a defense motion for mistrial, and defendant's own attorney conceded that there was no such evidence of such an intent. On this record, then, a habeas court cannot possibly conclude that the state court's decision was contrary to or represented an unreasonable application of the holding in *Oregon v. Kennedy*. To the contrary, it was a demonstrably correct application of federal law.

In support of his habeas claim, petitioner has merely presented to this court the appellate briefs filed in the state system on this issue. In those briefs, petitioner's appellate counsel argued that Michigan law recognized a more lenient standard than that established by the United States Supreme Court in *Oregon v. Kennedy*. Relying on *People v. Dawson*, 397 N.W.2d 277 (Mich. Ct. App. 1986), *aff'd*, 427 N.W.2d 886 (Mich. 1988), petitioner's appellate counsel argued that the Michigan courts follow a more lenient standard, which bars a retrial on double jeopardy grounds when the prosecutor engaged in conduct known to be improper and prejudicial, with indifference to a significant danger of mistrial or reversal. Judge Kolenda rejected this argument on the ground that the language in the Court of Appeals decision was non-binding *dictum* and that the state Double Jeopardy Clause was intended to accord the same protection provided by the Fifth Amendment, no more and no less. (Op., 2). This argument, although relevant in the state appellate courts, is irrelevant to a habeas corpus decision. Habeas relief is available only for a violation of rights guaranteed by the federal Constitution or laws. 28 U.S.C. § 2254(a). Violations of state-law rights are simply not grounds for habeas corpus relief. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

The state circuit court properly rejected petitioner's double jeopardy challenge to his conviction under the governing standard enunciated by the Supreme Court in *Oregon v. Kennedy*. The only issue before this court is whether the state-court determination was contrary to or an unreasonable application of the holding of the *Kennedy* decision, and the answer to that question is clearly no. Violation of a more lenient state-law standard cannot form the basis for habeas corpus relief. Petitioner's double jeopardy claim must therefore be rejected.

## II.    Introduction of Evidence of Uncharged Crimes

In his motion for a new trial, petitioner argued that his due-process rights were abridged by evidence of prior, uncharged crimes. Judge Kolenda rejected this contention, finding that no such evidence had been admitted. The court's opinion identified only two allegedly prejudicial statements challenged by petitioner's counsel. The first was that petitioner was a "target of investigation" by a police officer. The court ruled that this vague statement "did not inform anyone of any criminal activity beyond that which was the subject of the trial." (Op., 2). The court further found that a police officer's testimony that petitioner's fingerprints were "on file" with the State Police did not inform the jury of prior convictions or bad conduct, because a person's fingerprints can be on file for reasons other than prior convictions. Because the state court expressly addressed this due-process claim, petitioner can obtain habeas corpus relief only by demonstrating that Judge Kolenda's decision was contrary to or represented an unreasonable application of clearly established Supreme Court holdings.

As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part

-24-

of the federal court's habeas review of a state conviction . . . [for] it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 1704 (2008); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Bey*, 500 F.3d at 521; *Seymour*, 224 F.3d at 552. Further, under the AEDPA, the court may only grant relief if a petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Bey*, 500 F.3d at 521-22; *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

Petitioner has not met this difficult standard. The admission of the vague testimony challenged by petitioner violated no traditional and fundamental principle of justice. The United States Supreme Court has declined to hold that the admission of "other bad acts" evidence is so unfair that it violates fundamental concepts of justice. *See Dowling v. United States*, 493 U.S. 342, 352-53 (1990). Although the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms. Thus, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting

propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512; *see Bey*, 500 F.3d at 520.  Accordingly, the state-court's decision was neither contrary to nor an unreasonable application of Supreme Court precedent.

### III.  Presentation of Perjured Testimony

Petitioner's next claim is based upon the allegation that Brad Little, the confidential informant, lied when he testified concerning the nature of drug charges that were dropped in consideration for his testimony.  Little stated under oath, in response to questions by the attorneys and the court, that a charge of possession of cocaine had been dropped in Newaygo County in exchange for his testimony against petitioner.  Petitioner now asserts that his testimony was perjured, because the dropped charges involved methamphetamine, not cocaine.  Petitioner's appellate attorney first raised this claim in the Michigan Court of Appeals, in an application for leave to take a delayed appeal.  The Court of Appeals denied the application without comment.  Because the state Court of Appeals did not address the merits of this claim, review in this court is *de novo*.  *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *Fleming v. Metrish*, 556 F.3d 520, 531 (6th Cir. 2009).  Consequently, no deference is paid to the result in the state Court of Appeals, as there is no reasoning to which the habeas court can defer.  *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003).

The Fourteenth Amendment right to due process prohibits a knowing and deliberate use by a state of perjured evidence in order to obtain a conviction.  *See Napue v. Illinois*, 360 U.S. 264, 269 (1959).  This claim encompasses use of testimony, whether elicited or left uncorrected, that the prosecutor knows or should know is false.  *See Giglio v. United States*, 405 U.S. 150 (1972). The presentation of perjured testimony, without more, does not rise to the level of a constitutional

violation. *See Briscoe v. LaHue*, 460 U.S. 325, 327 (1983); *see also Abdus-Samad v. Bell*, 420 F.3d 614, 626 (6th Cir. 2005). Rather, it is the knowing and deliberate use of perjured evidence by the prosecution that creates a constitutional infringement. *See Foley v. Parker*, 488 F.3d 377, 391-92 (6th Cir. 2007), *cert. denied sub nom. Foley v. Simpson*, ___ U.S. ___, 128 S. Ct. 2507 (2008); *Burks v. Egeler*, 512 F.2d 221, 229 (6th Cir. 1975). The defendant must show that the statement in question was "indisputably false," rather than merely misleading. *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000).

Assuming for present purposes that the charges against Little involved methamphetamine and not cocaine, and that his testimony was therefore false, the record is devoid of evidence that the assistant prosecutor knew it. The issue was first explored in a separate record outside the presence of the jury, during which the assistant prosecutor asked Little whether he had been promised anything in exchange for his testimony. His first answer was "no." (TT II, 42, docket # 19). The assistant prosecutor confronted him with his statement to her the day before, in which he had mentioned a deal. Little then disclosed the dropping of a traffic offense. The assistant prosecutor asked whether there was anything else, and Little again answered "no." (*Id.*). The assistant prosecutor then reminded Little of *defense counsel's* contention during opening statement that a cocaine or methamphetamine case had been dismissed in Newaygo County. Little responded, "No, it was cocaine." The prosecutor then asked Little why he had not told her about the drug case the day before, to which Little responded, "No there's no reason I didn't bring it up." (*Id.*, 43-44). When Judge Kolenda asked about the nature of the charges, Little responded that it was a case of possession of cocaine. (*Id.*, 44).

The record in this case makes it patently obvious that the Kent County assistant prosecutor knew nothing about the Newaygo County charges except what Brad Little himself told her. The charges had been dropped six months earlier in another jurisdiction. For whatever reason, Little was not eager to disclose the nature of those charges. He failed to inform Assistant Prosecutor Brinkman of any drug charge in their interview the day before the trial, and his first two answers to her on the separate record were evasive. On this record, there is absolutely no evidence that the assistant prosecutor knew or should have known that Little's characterization of the nature of the dismissed drug charges was inaccurate. It is significant that petitioner's appellate counsel presented no evidence to the appellate courts to support a charge of the knowing presentation of perjured testimony. Counsel's argument to the Court of Appeals was as follows:

> A little effort by the Prosecution to investigate this public record would have disclosed not only that there was an added inducement for the witness to testify (by dismissing a meth charge) but that the witness committed perjury. Either, and certainly both, of the foregoing testimony derived [sic] defendant of his Am VI right to a fair trial and must result in a dismissal.

(Application for Leave to Appeal at 20, found in Michigan Court of Appeals record, docket # 26). At best, this is an accusation that the prosecutor was negligent in failing to do her own research concerning the nature of charges pending in another county, rather than taking Little's word for it. Negligence, however, is not the issue. The question is whether the assistant prosecutor knowingly presented perjured testimony. The record contains no evidence to support such a finding.

Upon *de novo* review of this issue, I find that petitioner has failed to demonstrate a due-process violation arising from the knowing and deliberate use by the state of perjured evidence.

-28-

IV.     *Brady* **Violation**

Petitioner's fourth claim for habeas corpus relief is a reiteration of his request in the state Court of Appeals for a new trial, based on newly discovered evidence.  The newly discovered evidence is a printout from the 78th District Court showing that Brad Little was arrested on May 19, 2004, on a charge of possession of methamphetamine.  It further shows that the charge was *nolle prossed* on June 17, 2004, about seven months before petitioner's trial in the Kent County Circuit Court.  Petitioner argues, as his appellate attorney did in the state Court of Appeals, that the prosecutor's failure to procure and disclose this printout constitutes a violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  Because the state Court of Appeals denied leave to appeal without analysis of this claim, habeas review is *de novo*.

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that due process requires the prosecution to disclose evidence favorable to an accused upon request, when such evidence is material to guilt or punishment.  The government's obligation to disclose favorable evidence under *Brady* covers both exculpatory evidence, *see United States v. Bagley*, 473 U.S. 667 (1985), and information that could be used to impeach government witnesses, *see Giglio v. United States*, 405 U.S. 150 (1972).  In particular, an agreement with a government witness for testimony in exchange for favorable treatment in the criminal justice system must be disclosed as impeachment evidence, especially where the witness's testimony is an important part of the government's case.  *Giglio*, 405 U.S. at 154-55.  In *Giglio*, the defendant discovered after trial that the government had failed to disclose a promise of immunity made to the defendant's co-conspirator, the government's only witness.  *Id.* at 150-51.  Finding that the government's case "depended almost entirely" on the witness's testimony, the Supreme Court reversed the conviction because "evidence of any

-29-

understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it." *Id.* at 155.

Petitioner's due-process claim cannot be sustained under these authorities, on two separate grounds. First, the prosecution was careful to disclose the dropping of drug charges against Little as consideration for his testimony. The record shows that defense counsel was aware of the consideration, and a challenge to the witness's credibility on the basis of this deal was a centerpiece of defense counsel's strategy, from the opening statement through final argument. The relevance of such information under *Giglio* and like cases is that it reflects on the witness's credibility, as the plea arrangement gives the witness an incentive to lie or at least shade his testimony. That point was made repeatedly to the jury.

The only mistake made, if there was a mistake, was in the nature of the drug charge involved. The charge against Little was brought under the Michigan Health Code, MICH. COMP. LAWS § 333.7403, which criminalizes possession of a number of controlled substances. Regardless of whether Little was charged for possessing cocaine in violation of subsection 2(a) or methamphetamine in violation of subsection 2(b), by testifying, he avoided a felony drug conviction and a potentially lengthy prison sentence. MICH. COMP. LAWS § 333.7403(2)(a), (b). In these circumstances, the identity of the particular controlled substance possessed was not material. In *Bagley*, the Court held that evidence is material under *Brady* if there is a reasonable probability that disclosure of the evidence would have changed the outcome of the proceeding. 473 U.S. at 682. A reasonable probability under *Bagley* is a "probability sufficient to undermine confidence in the outcome." *Id.* The Supreme Court has never held that the Constitution requires disclosure of the precise charges that the witness avoided as consideration for his testimony. The material issue is the

-30-

"understanding or agreement as to a future prosecution," *Giglio*, 405 U.S. at 155, and not the details

of the charge that was dropped.  The material fact that the prosecutor was obliged to disclose under

*Giglio* was the dismissal of a serious felony drug prosecution in exchange for Little's testimony.  The

particular drug possessed was not material.[1]

This lack of materiality is demonstrated by the holding of the Sixth Circuit in

*Williams v. Coyle*, 260 F.3d 684 (6th Cir. 2001), a habeas case decided under AEDPA.  In *Williams*,

the prosecution failed to divulge an alleged deal with the witness altogether.  The court held that this

failure was not material, because the jury knew of the *possibility* of leniency:

> Even if we assume such a deal existed, we do not believe the prosecution's
> failure to disclose it would have been material.  While the jury would not have been
> aware that a deal existed, it was fully aware of the witnesses' motivation for
> testifying -- the hope of getting favorable treatment from the prosecution in their own
> cases.  Williams's counsel extensively cross-examined the witnesses.  Anderson
> admitted that he hoped his testimony would benefit him in his case.  And the
> prosecution stated it would consider the witnesses' cooperation in determining how
> to dispose of their cases.  Thus, the jury knew of this reason to question the veracity
> of their Anderson's and Brooks's testimony.  We do not believe that knowledge of
> the existence of an actual deal prior to deliberation would have given the jury a
> greater reason to question the veracity of Anderson's and Brooks's testimony.  At
> least, not to the level that not knowing undermines confidence in the outcome.  *See
> Byrd v. Collins*, 209 F.3d 486, 518-19 (6th Cir. 2000).

260 F.3d at 708.  The holding in *Williams* shows that the material fact required to be disclosed is the

granting of consideration for the witness's testimony, which is the source of possible bias.  In

---

[1] Petitioner seems to believe that the dismissed Newaygo County drug charge was admissible as evidence that Little was involved with methamphetamine and that he, and not petitioner, was responsible for the attempted manufacture of methamphetamine.  Petitioner was charged with knowingly maintaining a place where methamphetamine was manufactured, not with the act of manufacturing the drug.  Therefore, even if Little were responsible for the manufacturing, petitioner would not have been absolved.

*Williams*, as in the present case, the jury's knowledge of further details would not have given it a greater reason to doubt the witness's veracity.

Petitioner's *Brady* claim is subject to rejection for a second and independent reason. The government need not disclose evidence readily available to the defense from other sources. *See, e.g., Spirko v. Mitchell*, 368 F.3d 603, 611 (6th Cir. 2004). For example, in *United States v. Bracy*, 67 F.3d 1421, 1428-29 (9th Cir. 1995), the court rejected a claim of *Brady* violation arising from a failure to disclose a government witness's criminal background in Florida and Wisconsin, because defense counsel had access to a computer printout and two reports sufficient for the defense to discover the witness's criminal history. Likewise, in *LeCroy v. Secretary of Florida Dep't of Corr.*, 421 F.3d 1237, 1267-68 (11th Cir. 2005), the court rejected claims of a *Brady* violation despite the state's failure to turn over petitioner's medical and school records, because his counsel could have obtained those records with reasonable diligence. In the present case, petitioner's appellate counsel was easily able to obtain a printout from the state district court concerning the Newaygo County prosecution, which had concluded six months before trial began. In her opening statement, trial counsel referred to the prosecution as a methamphetamine charge (TT I, 154) but later referred to it as a cocaine charge, after Little testified. Obviously, defense counsel was fully aware before trial of the existence of drug charges in Newaygo County. If the precise nature of the drug charges were material (and it was not), counsel could have readily obtained the same record that appellate counsel obtained. In these circumstances, petitioner cannot possibly sustain his contention that the prosecutor somehow hid or suppressed material impeachment evidence under *Giglio*.

Petitioner also makes a half-hearted claim of ineffective assistance of trial counsel arising from her failure to procure the Newaygo County printout showing the precise nature of the

dismissed drug charge involving Brad Little.[2]  Petitioner's claim of ineffective assistance of trial counsel is governed by the standard enunciated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), under which petitioner must prove that counsel's performance both fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced the defendant, resulting in an unreliable or fundamentally unfair outcome in the proceeding.  466 U.S. at 687-88.

Petitioner has not satisfied either prong of the *Strickland* standard.  First, in judging counsel's performance, there is a strong presumption that counsel's strategy and tactics fall within the wide range of reasonable professional assistance.  *Strickland*, 466 U.S. at 689.  In the present case, defense counsel was obviously aware of the dismissed drug charge in Newaygo County and used it effectively in opening statement, cross-examination, and final argument.  The material fact for impeaching Little's credibility was his favorable deal with another prosecutor in exchange for his testimony.  The precise nature of the drug that he allegedly possessed was not material.  Likewise, petitioner cannot show prejudice, as Brad Little was thoroughly impeached with regard to his motive to fabricate arising from his arrangement with prosecutors.

Upon *de novo* review, I find that petitioner has not remotely established a *Brady* violation or an abridgement of his right to the effective assistance of counsel.  His fourth ground for habeas corpus relief should therefore be denied on its merits.

---

[2] This claim does not appear in the habeas corpus petition and is probably not properly before the court.  It does appear in the attachments to the petition, which include the briefs filed in state court appellate proceedings.

**<u>Recommended Disposition</u>**

For the foregoing reasons, I recommend that the habeas corpus petition be denied in its entirety.


Dated:   May 19, 2009                           /s/  Joseph G. Scoville
                                                United States Magistrate Judge


**<u>NOTICE TO PARTIES</u>**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Neuman v. Rivers*, 125 F.3d 315, 322-23 (6th Cir.), *cert. denied*, 522 U.S. 1030 (1997); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).